# IN THE COURT OF APPEALS OF IOWA

No. 23-1233
Filed January 9, 2025

IN RE THE MARRIAGE OF MARK ALLEN GROENENDYK
AND TAMMY JEAN GROENEDYK

Upon the Petition of
**MARK ALLEN GROENENDYK,**
        Petitioner-Appellant/Cross-Appellee,

And Concerning
**TAMMY JEAN GROENENDYK,**
        Respondent-Appellee/Cross-Appellant.
_____

        Appeal from the Iowa District Court for Mahaska County, Lucy J. Gamon,

Judge.


        Former spouses appeal and cross-appeal from the financial provisions of

the decree dissolving their marriage.  **AFFIRMED AS MODIFIED ON APPEAL;**

**AFFIRMED AS MODIFIED ON CROSS-APPEAL.**


        Katie L. Gallo and James R. Hinchliff of Shindler, Anderson, Goplerud &

Weese, P.C., West Des Moines, for appellant/cross-appellee.

        Bryan J. Goldsmith and Carly M. Schomaker of Gaumer, Emanuel &

Goldsmith, P.C., Ottumwa, for appellee/cross-appellant.


        Considered by Badding, P.J., and Langholz and Sandy, JJ.

**BADDING, Presiding Judge.**

Thirty-three years of marriage, eleven children, 900 acres of farmland, more than seven million dollars in assets, three days of trial, thousands of pages of exhibits, a sixty-three-page dissolution decree, a cash equalization payment of $1,739,531, and zero spousal support. That's the story of Mark and Tammy Groenendyk's divorce in numbers, some of which the parties challenge on appeal and cross-appeal. We affirm the decree as modified on appeal and cross-appeal.

## I. Background Facts and Proceedings

Mark and Tammy were married in June 1990, when Tammy was a twenty-year-old college student. After their marriage, Tammy stopped attending school and worked as a bank teller for two years until the couple's first child was born. Their second child was born two years later, and they later adopted nine children, several of whom have special needs. Tammy has not worked outside of the home since their first child was born, instead devoting her time to "[c]aring for the kids, taking care of the household, and home-schooling the kids."

Mark, meanwhile, devoted his time to farming with his father and brothers and providing income for the family. He came into the marriage with a 290-acre farm, nicknamed the River Bottom Farm, that his parents helped him purchase. From there, Mark expanded the operation to include seven other farms. Mark's father passed away in May 2020, leaving him additional farmland and equipment, along with life insurance proceeds. The couple separated in February 2021, with Mark petitioning for divorce that same month.

Before the trial in May 2023, Mark and Tammy agreed that their four minor children should be placed in their joint legal custody and Tammy's physical care.

Mark was fifty-six years old by then, and Tammy was fifty-three. They could not agree on Mark's child support obligation or whether he should also pay support for three adult children who still lived with Tammy because of their disabilities. They also disagreed about the division of their property, spousal support, and attorney fees.

At the end of the three-day trial—in a detailed decree—the district court set Mark's gross annual income at $201,173 and accepted Tammy's estimated gross annual income of $35,000, which was based on income that Tammy hoped to generate through three farms that she asked to be awarded. This resulted in Mark owing Tammy $3158 per month in child support for the four minor children. The court did not order him to pay dependent adult child support and denied Tammy's request for spousal support. Tammy was awarded the three farms that she requested, while Mark received the other farms. The court set aside a farm that Mark inherited from his father, valued at $2,700,000, along with other money inherited by and gifted to Mark. To equalize the property division, the court ordered Mark to pay Tammy $1,739,531 within 180 days from the date of its decree, along with $40,000 for her trial attorney fees.

Mark appeals, claiming the property division was inequitable because the court (1) incorrectly determined the value of a farm awarded to Tammy; (2) failed to credit Mark for a debt that he owed to his father; (3) incorrectly determined the premarital and gifted value of a farm awarded to Mark; and (4) disregarded "the debt-free nature of the property awarded to Tammy and the debt burden to Mark when dividing property." Tammy cross-appeals, challenging a debt assigned to

Mark and the court's failure to award her spousal support. She also asks for an award of appellate attorney fees.

## II. Standard of Review

We review equitable proceedings, like dissolutions of marriage, de novo. *See* Iowa R. App. P. 6.907; *In re Marriage of Miller*, 966 N.W.2d 630, 635 (Iowa 2021). "We give weight to the findings of the district court, particularly concerning the credibility of witnesses; however, those findings are not binding upon us." *In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013). The court's ruling will be disturbed "only when there has been a failure to do equity." *Id.* (citation omitted).

## III. Analysis

### A. Property Division

Under our equitable distribution scheme, the first task in dividing a divorcing couples' property is "to identify and value all the assets subject to division." *Id.* at 678. "The second task is to divide this property in an equitable manner" after considering the factors in Iowa Code section 598.21(5) (2021). *In re Marriage of Fennelly*, 737 N.W.2d 97, 102 (Iowa 2007).

For the first task, "[a]ll property of the marriage that exists at the time of the divorce, other than gifts and inheritances to one spouse, is divisible property." *In re Marriage of Sullins*, 715 N.W.2d 242, 247 (Iowa 2006); *see also* Iowa Code § 598.21(6). "This broad declaration means the property included in the divisible estate includes not only property acquired during the marriage by one or both of the parties, but property owned prior to the marriage by a party." *Fennelly*, 737 N.W.2d at 102 (cleaned up). "Property brought into the marriage by a party is

merely a factor to consider by the court, together with all other factors," in accomplishing the second task—an equitable distribution of property. *McDermott*, 827 N.W.2d at 678 (citation omitted). Some of those other factors include "the length of the marriage, contributions of each party to the marriage, the age and health of the parties, each party's earning capacity, and any other factor the court may determine to be relevant to any given case." *Fennelly*, 737 N.W.2d at 102; *see also* Iowa Code § 598.21(5).

With these principles in mind, we turn to the parties' claims on appeal.

### 1. Value of 1435 Southside Farm/Stursma South

The three farms awarded to Tammy included what the parties referred to as the homeplace, "1435 Northside Farm," and "1435 Southside Farm/Stursma South." At trial, the parties agreed the 1435 Southside Farm/Stursma South was worth $581,000. Mark asked for that farm to be awarded to him and claimed that $35,975 of its value should be set aside as inherited property from his grandfather. The district court decided to award the farm to Tammy instead but agreed with Mark on its inherited value. In its property division worksheet, the court placed $545,025 in Tammy's column of assets:

| | MARK | TAMMY | GIFTED or INHERITED VALUE | | PREMARITAL VALUE | OTHER |
|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | |
| 1. 1435 260th - Homeplace (Scott S23 Home Farm - House) | | $ 215,000 | | | | |
| 2. 1435 Northside Farm (Scott S23 Home Farm less house) | | $ 690,000 | | | | |
| 3. 1435 Southside Farm/Stursma South (Scott S26 Farm) | | $ 545,025 | $ 35,975 | (M) | | |

The court then calculated Mark's equalization payment to Tammy based on that value, following which it subtracted $35,975 from the total Mark owed to Tammy:

| | | | | | |
|---|---|---|---|---|---|
| NET VALUE | $ 5,430,229 | $ 1,854,483 | | | |
| | | | | | |
| SUMMARY | | | | | |
| MARITAL EQUITY | $ 5,430,229 | $ 1,854,483 | | | |
| MARK'S EQUALIZATION PAYMENT TO TAMMY | $ (1,787,873) | $ 1,787,873 | | | |
| MARITAL EQUITY AFTER EQUALIZATION | $ 3,642,356 | $ 3,642,356 | | | |
| TAMMY'S PAYMENT TO MARK-PARTIAL INHERITED REAL ESTATE | $ 35,975 | $ (35,975) | | | |
| | | | | | |
| MARK'S EQUALIZATION PAYMENT TO TAMMY AFTER OFFSET | | | | | |
| ($1,787,873 - 35,975 = $1,751,898) | | | | | |

Mark challenges this calculation. He acknowledges the court correctly offset his inheritance "*after* identifying an equalization payment." But he argues the court placed an incorrect value on the 1435 Southside Farm/Stursma South Farm for purposes of calculating the parties' respective equalization payments "*before* offsetting the inherited portion." We agree. The district court's calculation improperly discounted Tammy's net award of divisible property, and thus artificially increased her equalization payment. The value for the farm in Tammy's column should have been $581,000 when calculating Mark's cash equalization payment, before the deduction of $35,975 was made from that payment to credit Mark for the inherited portion of the property that Tammy received. The impact of this adjustment on the cash equalization payment to Tammy will be discussed after we address the parties' remaining challenges to the property division.

### 2. $309,000 Credit to Mark for Debt Owed to His Father

Mark claimed that when his father passed away in May 2020, Mark and Tammy owed him $309,000. Mark tried to trace this debt to a promissory note they signed on March 21, 2012, promising to pay his father $100,000 at three percent interest, payable annually. The note stated that the funds were advanced for "[r]efinancing farm debt," although Mark thought the loan was to help buy the 1435 Southside Farm/Stursma South. In any event, Mark agreed that he paid

$73,000 on the note in 2015. Yet he maintained the note "grew to a $300,000 note plus principal and interest" for the purchase of other farms.

To support this claim, Mark pointed to a balance sheet from 2018 that showed a long-term debt of $300,000, with annual interest of $9000, payable to Mark's father. Mark claimed payment of that interest as an expense on the couple's 2018 income tax return. And, as the executor for his father's estate, Mark listed the debt on the probate inventory, although the estate was closed without Mark paying the debt. However, Mark agreed at trial that the first time the debt was documented was in 2018—during a prior divorce action that Tammy initiated. He also agreed that, aside from the March 21, 2012 note for $100,000, there was "nothing signed between [him] and [his] Dad that says [he] borrowed $300,000 from him."

Yet Mark contends this self-reported trail is enough to establish that the debt existed and that he inherited the forgiven debt as the residuary beneficiary of his father's estate. The district court adopted Tammy's view that the debt likely arose out of the 2018 divorce proceeding that was later dismissed. She testified that before then, she did not know about this loan. Tammy added that in her thirty-plus years of marriage to Mark, she would not expect him to participate in such a transaction without paperwork. Indeed, all of Mark's other loans were documented. On our de novo review of the record, we agree with the district court that "there is no evidence in the record for a $300,000 loan" that should be set aside to Mark as an inheritance.

**3.      Value of River Bottom Farm**

Mark next claims the district court did not account for all the premarital and gifted portions of the River Bottom Farm, valued at $1,720,000, that was awarded to him.  From that value, Mark asked the court to set aside $1,027,500—reflecting $167,500 in premarital property and $860,000 as a gift from his parents.

In addressing these claims, the court found:

> Mark purchased this real estate in 1989.  Mark claims that $860,000 of this value was gifted to him by his parents.  Mark's testimony was that his parents paid half of the initial purchase price and he paid the other half of the purchase price using a mortgage.  The mortgage is in the amount of $42,000, so presumably what Mark meant was that his parents had gifted him $42,000 for the purchase of this property.
>
> The River Bottom Farm has been involved in extensive litigation. . . .  Mark's parents were divorced in 2009.  During that divorce, Mark testified that his parents disclaimed any interest in the property when legal issues arose.  His parents relied on Mark to handle these legal issues.  The Court [in Mark's parents' divorce] found that Mark was the sole owner of the property.
>
> The Court accepts that Mark's parents gave him $42,000 to purchase this farm in 1989, and that said amount should be set aside to Mark as a gift.  As the property was always titled in Mark's name, the Court finds that the gift was completed in 1989.  By his own testimony, Mark has made many improvements to this property over the years.  This farm has been used to generate household income.  Tammy made at least equal contributions to the marital endeavor over the course of thirty years. . . .  [T]he length of the marriage is one of the most important factors in determining whether a commingled asset has become a marital asset.  Based on the above analysis, the Court finds that the appreciation on this commingled asset should be considered a marital asset.
>
>       . . . .
> The source of Mark's figures for pre-marital property ($92,500 plus $75,000) remains hazy to the Court, although Mark testified on this issue numerous times during the trial. . . .  As best as the Court understands it, Mark paid at least $42,000, as there is a mortgage which evidences this amount.  Mark testified repeatedly that he "doubled" the purchase price to arrive at his claim for $92,500, although $42,000 times two does not equal $92,500, and the Court has already set aside the value of gifted property from [Mark's] parents as set forth above.  Mark testified several times, in a very

confusing manner, that $92,500 was "double the price on my half," but that he had also "doubled the ground." The Court finds no paper trail for anything but the $42,000 mortgage. . . .

Mark and his father, Larry, apparently contributed both time and money to improve this property. . . . Mark also claimed that he incurred various pre-marital expenses for the farm, and that his mother kept track of the expenses on a handwritten ledger. . . . As best the Court understands, Mark is claiming that these "expenses" amount to $75,000, and that this is somehow a "debt" to him. The reason that Mark classified this item as a "debt" remains unclear to the Court.

Considering all of the above factors, the Court determines, in the exercise of its discretion, to set aside $50,000 of the value of Mark's River Bottom Farm to Mark as pre-marital property (his share of the purchase price as evidenced by the mortgage, plus some value of improvements made prior to the marriage). After the set-asides, the resulting marital value for Mark's Bottom Farm is $1,620,000 [$1,720,000 minus $42,000 (gifted) minus $50,000 (pre-marital)].

Mark makes the same hazy arguments on appeal as he did before the district court. Upon our de novo review of the record, we find no inequity in how the court divided this farm. *See In re Marriage of Vieth*, 591 N.W.2d 639, 640–41 (Iowa Ct. App. 1999) ("[W]e give strong deference to the trial court which, after sorting through the economic details of the parties, made a fair division supported by the record."); *accord In re Marriage of Krieg*, No. 10-1903, 2011 WL 2713696, at *2 (Iowa Ct. App. July 13, 2011). We accordingly reject Mark's arguments for the same reasons as the district court.

### 4. Debt to Legacy Ranch

For her first issue on cross-appeal, Tammy claims the trial court erred when it "ordered Mark to pay a debt owed to himself but made no corresponding valuation of the asset." That debt is a $290,558 promissory note owed to Legacy Ranch, Inc.—the corporation through which Mark operated his farms. Mark is the sole shareholder of the corporation, which holds the farm equipment and pays rent

to the couple "personally for operating the ground." Tammy agreed at trial that the corporation should be awarded to Mark at an unknown value, but she maintained the $290,558 should not be included in the property division because it was a debt that Mark owed to himself.[1]

Mark testified that when the couple purchased some of their farms, the corporation lent them money. The debt was recorded by their accountant on a "shareholder notes receivable," which also tracked money the couple paid into the corporation over the years. The balance owed to the corporation as of December 31, 2022, was $290,558.17. Mark signed a promissory note on that date—personally as the borrower and on behalf of the corporation as the lender.

On cross-examination at trial, Mark agreed with Tammy's attorney that "any debt that you owe to Legacy Ranch is a debt that you would owe to yourself effectively" and "that debt is an asset of Legacy Ranch." In other words, Mark acknowledged that if he "paid off the debt to Legacy Ranch, Legacy Ranch would then have $290,000 in the bank account," which he owned and was awarded in the divorce. But Mark maintained their accountant advised him that "someone has to go make $290,558.17 at some point in our lifetime and pay Legacy Ranch, Inc., for the money borrowed."

---

[1] Because Tammy "stipulated to an 'unknown' value of Legacy Ranch, Inc. prior to trial," Mark argues that she did not preserve error on this claim. We disagree. While she did not separately value the corporation, Tammy clearly maintained through her questioning of Mark and the accountant that the debt should either be excluded from the property division or, if it was included, the corporation's value should go up by the same amount. We accordingly find error was preserved for our review. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appeal review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal.").

While the accountant agreed the debt to the corporation needed to be repaid, he also testified on cross-examination that it was a debt Mark owed himself:

> Q. And when we talk about there being a debt from Mark and Tammy or Mark personally to Legacy Ranch, do you agree with me, that's effectively a debt to themselves?  A. Correct.
> Q. If, for example, Mark owed Legacy Ranch $10, do you agree with me that debt would be an asset of Legacy Ranch in the amount of $10?  A. Correct.
> . . . .
> Q. Well, let's just assume for a second that the debt is only in Mark's name or only Mark's obligation.  Okay?  A. Sure.
> Q. So Mark would have a liability personally of $10?  A. Sure.
> Q. He would have an asset through Legacy Ranch of $10?  A. Uh-huh.
> Q. Yes?  A. Yep, correct.
> Q. That's a[ ]wash?  A. Correct.
> Q. No impact on his net worth?  A. Correct, yep.

We agree with Mark that Legacy Ranch, Inc. is a separate legal entity.  *See In re Marriage of Murray*, 213 N.W.2d 657, 660 (Iowa 1973).  But that does not mean it was equitable to include the $290,558 debt to the corporation—which was not separately valued by the district court—in the division since the parties and their accountant agreed that Mark would be repaying that money to himself.  In a similar corporate scenario, we affirmed a district court decision excluding a debt the husband owed to his corporation, in which the court reasoned:

> It is just a numbers crunch.  All of the exhibits that deal with [the corporation], any debt against [the corporation], and the residuary trust involved in this case are all documents and transactions involving [the husband].  [He] signs as the seller and the purchaser.  He signs as the trustee and one of the residuary beneficiaries of the trust.  He signs the promissory note on behalf of himself as one entity to himself as the representative of another entity.  These are well and good when it comes to setting up tax shelters and structuring businesses so that you can maximize tax advantages and cash flow, primarily for the IRS.  It really has little to do with an equitable value to be attached to the asset or the debt.

*In re Marriage of Smith*, No. 12-0337, 2012 WL 5356080, at *5 (Iowa Ct. App. Oct. 31, 2012); *accord In re Marriage of Romey*, No. 02-1539, 2004 WL 57566, at *2 (Iowa Ct. App. Jan. 14, 2004) (affirming court's exclusion of a shareholder loan the husband and sole shareholder made to his corporation). In *Smith*, like here, the corporation itself was excluded from the property division, and the husband agreed the debt was "essentially owed to himself." 2012 WL 5356080, at *6. Under these facts, we find the court should not have included the $290,558 debt to Legacy Ranch, Inc. in its property division. With this modification, Mark's net property award increases from $5,412,494 to $5,703,052.

### 5. Modification to cash equalization payment

Our modifications to the district court's ruling regarding the value of the 1435 Southside Farm/Stursma South and the Legacy Ranch debt mean that Mark owes Tammy an increased cash equalization payment of $1,866,822.[2] In making these modifications, and otherwise examining the court's decision to award Tammy an equalization payment, we have considered Mark's argument "that Tammy will be receiving a substantial sum of cash and property debt free, while Mark will be required to incur debt to pay any form of equalization payment to Tammy and

---

[2] We arrived at this amount by adjusting Tammy's net property award to $1,897,458 to account for the agreed-upon value of $581,000 for the 1435 Southside Farm/Stursma South farm that she was awarded and by adjusting Mark's net property award to $5,703,052 after removing the $290,558 debt from his side of the ledger. This results in a property award differential of $3,805,594 in Mark's favor. Dividing that amount by half equals $1,902,797, from which we subtracted $35,975 to give Mark credit for his inherited portion of the 1435 Southside Farm/Stursma South farm. The end result is that Mark now owes Tammy $1,866,822.

continue to operate the farm." But we do not find that this reality means any adjustment is needed.

"[O]ur precedent acknowledges the public policy in favor of preserving family farming operations" like this one, which Mark intends to operate for as long as he is able, before passing it down to his children. *McDermott*, 827 N.W.2d at 683. Yet a spouse's "interest in preserving the farm should not work to the detriment of the other spouse in determining an *equitable* settlement." *Id.* We find the settlement here is equitable because, in addition to Mark's significant award of marital assets, he is also retaining a farm that he inherited from his father valued at $2,700,000, plus additional cash assets. *See id.* Of the five other farms awarded to Mark, only one was encumbered by a mortgage. The debt owed on that farm was down to $120,009 by the dissolution trial. Tammy's expert testified that it would be difficult for Mark to pay off a loan of more than $1,195,000 with less than a fifteen-year note, given his expected farming income, living expenses, and child support. But Mark could take out a longer-term note. And his child support obligation will end within the next few years.

Under these circumstances—and in conjunction with the spousal support discussion below—we find that Mark has the financial ability to make the cash equalization payment to Tammy to achieve equity in this dissolution. *See id.* at 684; *see also In re Marriage of Kimbro*, 826 N.W.2d 696, 703 (Iowa 2013) (recognizing that "equality is often most equitable" (citations omitted)).

**B.    Spousal Support**

This leaves us with Tammy's claim for spousal support. While this court reviews spousal support awards de novo, we "afford deference to the district court

for institutional and pragmatic reasons" and disturb its "determination of spousal support only when there has been a failure to do equity." *In re Marriage of Sokol*, 985 N.W.2d 177, 182 (Iowa 2023) (citations omitted). We find no such failure here.

Tammy asked the district court to award her $3000 per month in traditional spousal support. The court carefully considered her request but found that Tammy's property award would provide her with enough income to satisfy her anticipated monthly budget of $6229 and then some:

> Tammy is receiving approximately $3.7 million in marital assets (including three income-producing farms and at least $60,000 in proceeds from a farm equipment sale). She will also be receiving in the short term $37,896 in annual child support (with a declining balance as the children age out). This award of assets and support, if managed wisely, should allow Tammy to live comfortably for the rest of her life. She should be able to live in the lifestyle to which she has become accustomed without the need to work outside the home.
>
> Mark will incur significant borrowing costs to make any equalization payment to Tammy. Mark also deserves to live comfortably, and not just in a rented room, as he has done since the parties' separation. Mark might be able to earn more money by renting out or even selling some of the farms, but as he testified, it is very important to him to maintain the family farming operation and pass it down as a legacy to his children and grandchildren. Given all of the equity in the farms awarded to Mark, he should be able to refinance the farms rather than selling any of them, if the Court does not saddle him with any ongoing alimony or dependent adult monthly payments.
>
> Balancing all of the above factors, the Court determines to make no alimony award to Tammy in this case. For the reasons indicated above, the Court finds that the property settlement, including the sale of equipment proceeds, and the (time limited) child support award should allow Tammy to live comfortably for the rest of her life, even if she never works outside the home.

As the district court recognized, "[i]n assessing a claim for spousal support, we consider the property division and spousal support provisions together in determining their sufficiency." *In re Marriage of Hazen*, 778 N.W.2d 55, 59 (Iowa Ct. App. 2009); *accord* Iowa Code § 598.21A(1)(c). In finding that Tammy was

awarded $3.7 million in marital assets, the court included the cash equalization payment that Mark was ordered to pay. The court reasoned that if Tammy invested that award at four percent interest, she "should have at least $60,000 of net investment income each year" after taxes, on top of the $35,000 she expected to make from renting the farms she was awarded. *See In re Marriage of Schenkelberg*, 824 N.W.2d 481, 487 (Iowa 2012) (considering "the income potential of the property distributed to each party").

Tammy is correct that in marriages of long duration, "we have affirmed awards of both [spousal support] and substantially equal property distribution, especially where the disparity in earning capacity has been great." *In re Marriage of Hettinga*, 574 N.W.2d 920, 922 (Iowa Ct. App. 1997). But that result is not mandated by the statutory criteria in Iowa Code section 598.21A(1) or our caselaw. *See In re Marriage of Mills*, 983 N.W.2d 61, 67 (Iowa 2022) ("Spousal support is not an absolute right; rather, its allowance is determined based on the particular circumstances presented in each case."); *In re Marriage of Gust*, 858 N.W.2d 402, 412 (Iowa 2015) ("Where a spouse does not have the ability to pay traditional spousal support . . . none will be awarded."). And we find that it is unwarranted here for the reasons discussed by the district court. *See In re Marriage of Hayne*, 334 N.W.2d 347, 351 (Iowa Ct. App. 1983) ("[O]nce the dependent spouse's standard of living is assured, there is no reason, in equity, for the supporting spouse to provide still more."); *see also In re Marriage of Stark*, 542 N.W.2d 260, 262 (Iowa Ct. App. 1995) ("[T]he ability of one spouse to pay [spousal support] must be balanced against the needs of the other spouse."). So we affirm the court's denial of Tammy's request for spousal support.

### C.    Appellate Attorney Fees

Tammy asks for an award of appellate attorney fees.  "Appellate attorney fees are not a matter of right, but rather rest in this court's discretion."  *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005).  We must consider "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal."  *Id.*  Having considered these factors, and the district court's award of $40,000 in trial attorney fees to Tammy, we decline her request for additional fees on appeal.

## IV.    Conclusion

On our de novo review of the record, we make two adjustments to the district court's property division.  We find the court should have used the agreed-upon value of $581,000 for a farm that Tammy was awarded before calculating Mark's cash equalization payment and crediting him for the inherited portion of that farm. And we find the court should not have included a corporate debt of $290,558 on Mark's side of the ledger.  With these modifications, we order Mark to pay Tammy $1,866,822 within 180 days after procedendo issues or judgment shall enter against him for that amount, with interest at the statutory rate.  We deny the parties' remaining claims on appeal and cross-appeal, including Tammy's challenge to the court's failure to award her spousal support.  Her claim for appellate attorney fees is also denied.  Costs on appeal are assessed equally between the parties.

**AFFIRMED AS MODIFIED ON APPEAL; AFFIRMED AS MODIFIED ON CROSS-APPEAL.**